## LEWIS et al. v. EQUITABLE MORTGAGE CO.

*Simmons, C. J.*—Where a second verdict has been rendered on substantially the same issues of fact in favor of the same party, the rule of discretion applicable to the first grant of a new trial does not apply, and if at the last trial there was nothing objectionable in the rulings of the presiding judge, and the evidence, though conflicting, supported the second verdict, it should not be set aside. *Veal et al. v. Robinson*, 76 *Ga.* 838.

*Judgment reversed.*

*Lumpkin, J.*, dissenting.—In view of the evidence disclosed by the record in this case, I am of the opinion that the trial judge was right in setting aside the second verdict in favor of the plaintiffs in error. *Taylor* v. *Central Railroad & Bkg. Co.*, 79 *Ga.* 330, and cases there cited.

August 24, 1896.

Equitable petition. Before Judge Milner. Gordon superior court. August term, 1895.

In November, 1889, Jackson T. Lewis conveyed 990 acres of land in Gordon county to B. W. Cornelison, W. M. Cornelison and D. P. Cline, the deed reciting a consideration of $15,000. The grantees in this deed then made written application to the Atlanta Trust & Banking Company to negotiate for them a loan of $7,500, offering this land as security for the loan. The papers relating to the negotiation were forwarded by said company to the Equitable Mortgage Company, which was engaged in the business of lending money, with recommendation that it make the loan; and it did so, taking notes and a deed from the

Cornelisons and Cline to secure their payment. In default of payment, the Equitable Mortgage Company brought suit on the notes in May, 1891. In November thereafter it amended its petition, making Lewis and his wife parties defendant and praying for equitable relief against them. It was alleged, in brief, that the loan was procured by false representations of the value of the land, and in pursuance of a scheme originated by Lewis to defraud the plaintiff, he having previously applied to the plaintiff for a loan on the land, but being afraid the land would not bear the loan he wanted, he resorted to the artifice, in collusion with the other defendants, of selling it to them for the nominal sum of $15,000, pretending that $8,000 of that amount had been paid in cash, when in fact no cash had been paid and only an insignificant piece of land had been conveyed to represent the cash consideration, and the land so conveyed as security not really being worth over $3,000 or $4,000, and the borrowers being wholly insolvent and irresponsible; and that Lewis got the money so loaned by plaintiff, and invested it in certain described land in Bartow county, taking a bond for title to his wife. The object of the amendment was to subject this Bartow county land to so much of plaintiff's judgment as would remain unsatisfied after selling the Gordon county land thereunder. Lewis and wife made answers in which they denied all charges of fraud, etc. There was a trial resulting in a verdict for the plaintiff. A motion by Lewis and wife for a new trial was overruled, which judgment was reversed. 94 *Ga.* 574. After that decision further amendments to the petition were made; and there have been two trials, each resulting in a verdict in favor of Lewis and wife upon the issue made. Both of these verdicts were set aside by the trial judge. His last judgment granting a new trial on the grounds that the verdict was contrary to law and evidence is now excepted to by Lewis and wife.

The material allegations of the amendments last referred

to are as follows:   Plaintiff was doing business with the Atlanta Trust & Banking Co., a corporation of good standing and responsibility, in which plaintiff had great confidence; and it did not hesitate to take all loans offered by said Atlanta company, if no defects were apparent on the face of the papers, relying implicitly and absolutely on the recommendation of said company as to the value of the property offered as security in every case.   Said company was not the agent of plaintiff to make loans, but was a well established company and had a good business reputation, and plaintiff relied on its business methods for the ascertainment of the value of the property on which it made loans through it, both as to the inspection of property and as to other methods and means for the prevention of fraud as to values of securities.   One of the methods used by said company and known to plaintiff, for the prevention of fraud, was to require all persons applying for loans, who had purchased property within a year, to make affidavit as to what had been paid for the property, and how much had been paid in cash and how much was still due.   The object of this was to prevent a pretended sale for a nominal price of a larger amount than the real amount, so as to make a basis of credit; and the company had regular blanks for that purpose.   It was deceived by the device resorted to by Lewis, but for which deception it would not have recommended the loan to plaintiff.   It would have been directly contrary to a business rule of theirs to have done so; and they would not have done so if they had not been deceived by Lewis procuring Cornelison to make said affidavit. The fraud was practiced on the Atlanta company, and by it the recommendation of that company was secured, and by said recommendation based on the fraudulent representation the money was secured from plaintiff, which was well acquainted with the business methods of said company, and relied on its recommendation as to values with implicit confidence, and took securities that were recommended by it,

without making any investigation of its own as to their value.   On the first Tuesday in April, 1895, the property conveyed to plaintiff by the Cornelisons and Cline was sold at sheriff's sale under the execution issued on the judgment rendered against them in plaintiff's favor; and the amount realized by plaintiff from said sale was $5,995, less cost and expenses of sale, leaving a deficiency of $5,605 in paying the judgment, for which deficiency judgment is prayed against Lewis.

At the trial plaintiff introduced the interrogatories of B. W. Cornelison, taken August 11, 1892, as follows:  I am the father of W. M. Cornelison and the father-in-law of Cline.   We three bought the 990 acres of land in Gordon county from Lewis in the fall of 1889.   The consideration was $7,513.50.   It was all paid to Lewis as follows: $6,-713.50 in a check from a loan from plaintiff, paid by me in person; the other $800 was paid by Lewis getting the rent of the place for the first year.   The only money paid was the $6,713.50 paid from the loan.   I think I got the deed the same day it was paid.   The money was got from plaintiff for a loan on the land.   Lewis told me at the time he wanted the money to pay for some land he had purchased from Dyer, and he wanted me to borrow the money in my name, then pay it to him so that he could pay for the Dyer land.   Lewis and E. P. Reed both suggested this plan to me, and told me it would pay me to do it; they wanted the money and persuaded me to get it that way.   No other consideration was paid for this land, except as I have already stated.   Before we bought this land from Lewis, I did not own any property except the land where I live, which was worth $150, and some ordinary household goods, a horse, cattle, and personal property including solvent debts, all of which was worth about $6,000.   W. M. Cornelison and Cline were together worth about $2,000 before the purchase of the above property; it was nearly all in notes and accounts.   Outside of the mortgage or loan

on the Lewis place, which I do not consider that I owe, I owe about $60. W. M. Cornelison who lives in Whitfield county, and Cline who lives in Texas, are worth about what they were then. I do not know that they owe anything. Lewis held out no inducements to us to get us to buy the place, more than he said the rents of it would more than pay me for my trouble. He told me he paid the money he got from the place for the Dyer land. I saw Reed at the time the loan was made, but not before. He did say something to me about borrowing this money on the land, but I do not remember the details of the conversation. He represented Lewis, and was anxious for me to get the money for Lewis; he said it would be a good thing for me. I did sign a paper purporting to be an affidavit attested by E. P. Reed, notary public, in which it was stated that I and W. M. Cornelison and D. P. Cline had paid $15,000 for said land to Lewis, part of which had already been paid and the balance was to be paid out of the money borrowed from plaintiff; but I did not swear to it. When they asked me to sign it I said I would never do it—it was not true. Reed said it was a mere formality, and had to be signed before they could get the money, and I need not swear to it. I did not read it; just thought what Reed said was all right. He in the presence of Lewis procured me to sign it. Cline and W. M. Cornelison also signed it, but none of us swore to it. I am 55 years old; my son is 32, and Cline is about 38. I had no evil design or wrong intention toward plaintiff or any one else. Lewis is about 35 years old. He talked to me several times before the trade was made; he told me he had worked it up to get the money to pay for the land he had bought. He never could have got as much for the land in any other way. When I bought these lands I thought they were worth $10 an acre, but since I am better acquainted with them I know they are not worth it. Lewis said, in order to induce me to buy, that I could make a fair profit out of it. I think he misrepresented what the

place had paid for rent. I do not think he did beg, or persuade, or make any improper or unfair or fraudulent promises to induce me to buy the land. I do not know that he did or said anything, in the presence of Reed or any one else, to show that he was so anxious to make a trade with me as to be willing to defraud or wrong plaintiff. Both Lewis and Reed were present when the papers were signed, and at the other time I have testified about. Lewis did not tell me he had worked or was trying to work up a scheme to sell the land. I know nothing about his trying to get a mortgage on it with the design of selling it for more than it was worth.

Plaintiff introduced the affidavit referred to in its amendment and in the testimony of B. W. Cornelison, which was executed by the Cornelisons and Cline, and attested by Reed, stating "that we are the owners of the property upon which we have made application to the Atlanta Trust & Banking Company to negotiate for us a loan of $7,500," that they have bought said land from Lewis at private sale "and paid therefor the sum of $15,000, eight thousand dollars in cash and seven thousand dollars when this loan is secured," and that "this affidavit is made for the purpose of inducing the negotiation of the loan above mentioned, and as evidence of the value of the property offered as security." Also, the written application for the loan made at the same time with the affidavit, addressed to the Atlanta Trust & Banking Co., and requesting it to negotiate for the applicants a loan of $7,500 on the land in question. Among the representations in this application were, that the total value of the land was $22,295, that the applicants owned other land worth $4,000 and stocks and notes of credit worth $8,000, and had received $1,350 as rental for 225 acres of this land for the preceding year, and that they desired to borrow this money for the purpose of paying a balance of $7,000 due on this land. To this was appended a statement of Reed as correspondent, certifying

that the land so offered as security was given in or assessed for taxation at $8,500 for the preceding year. Also, the tax returns of Lewis and of B. W. Cornelison for 1889, Lewis giving the aggregate value of his land at $3,500, and his other property at $940, and the values given by Cornelison being $150 and $215. Also, two abstracts of title to the land in question, both in the handwriting of Reed and the latter bearing his certificate; the first dated October, 1889, and showing the title to be in Lewis, and the other dated December 6, showing the title to be in the Cornelisons and Cline, and the latter being approved by Hall & Hammond, December 10, 1889.

Plaintiff also introduced the testimony of its president, in brief, as follows: Plaintiff did an extensive business of lending money in Georgia and elsewhere. Applications for loans were sent to it by the Atlanta Trust & Banking Co.; and if the papers appeared to be all right and regular on their face, such loans as were recommended by that company would be made. The relation between plaintiff and that company was simply a business one. Plaintiff had no interest in the business of the Atlanta company, and nothing to do with its management. The methods adopted by it with reference to examination of titles and ascertaining values of property were well known to plaintiff. Its officers were reliable men, and for that reason, the plaintiff did not undertake to make any examination at all of its own in reference to values of property offered to it by the Atlanta company; it took the loans offered by said company on the faith it had in said company, and on that alone. It had to rely on the correct business methods and integrity of the company; it could not do business in any other way. The loan in question was treated in all respects as all other loans made by plaintiff in Georgia. It did not have the property examined, and made no effort to find out its value as security for the loan asked by the Atlanta company for the parties, except to rely on the recommendation of that com-

pany. We had no agents in Georgia for the examination of property, and had none to examine this property. Plaintiff had large and many transactions with the Atlanta company both before and after this loan was made. It knew that said company required, among other things, persons who had recently purchased property to make an affidavit as to what they had paid for it, and how paid, etc. This was relied on as furnishing protection against fraud in cases of that kind. I think it was the custom of all prudent persons and companies to require this, for the reason that fraud might be practiced if it was not done, a fictitious price being made to appear as having been paid for the land, thereby misleading the lender. The Atlanta company was not employed by plaintiff to make this loan for it, or to make any other loans; no consideration was ever paid by plaintiff to said company for making any examination of property, or in connection with the management of the business, in any shape or form. The company was entirely independent of plaintiff, and managed its own affairs. In our dealings it was understood that all loans offered should be so drawn as to bear six per cent. on their face, but enough should be added to the face of the note to make it equivalent to an eight per cent. loan. Plaintiff had nothing to do with any commission charges by the Atlanta company, or any expenses incurred or paid by it, and got nothing except the principal of its money with a little less than eight per cent. interest. I did, on December 5, 1892, write to one Lamar in Atlanta, in reply to a letter from him, that "all of our loans taken in your State are through the Atlanta Trust & Banking Company, to which we would respectfully refer you." Plaintiff made no loans in Georgia except such as were offered by the Atlanta company.

A. Richardson testified: I was cashier of the Atlanta company when the loan was negotiated. The application was for $7,500, and we added seven and a half per cent. to that, and took note for $8,062.52, so as to make it net eight

per cent. to the plaintiff, as the note bore only six per cent. The actual amount of money advanced by it was $7,500, and it got no part of the same back. The Atlanta company got the $562.62 as its charge on this loan, which was its regular charge. Reed was not the agent of the Atlanta company in this transaction; he received the application and sent it to me. The company did not pay him anything for his services; that was a matter between him and the borrower exclusively. Before this application was made, Lewis had been negotiating with the company with reference to a loan on this property. He forwarded this first abstract certified by Reed for that purpose. His application was withdrawn, and this one made in favor of Cornelisons and Cline. The affidavit as to what was paid for the land was essential to obtaining the loan; the object was to get at the market value of the property, and the price paid by the purchaser was considered one of the best evidences on that subject. Plaintiff and the Atlanta company had no connection, except that they did a considerable amount of business together. They were entirely separate in every way. Plaintiff did business in New York; the other company was in the loan business in Atlanta, advertising for loans and capital to place on loans. They placed a great many loans with other companies beside the plaintiff, and with individuals. At one time Fowler, the president of the plaintiff company, was a director of the Atlanta company. He did not organize it. He severed his connection with it several years ago. He was the only director that ever resided in New York. The Lewis application never reached me. I only drew up papers after loan had been accepted. The Atlanta company was not the agent of plaintiff. It was the paid agent of the Cornelisons and Cline. It did not negotiate loans for the plaintiff, but simply placed loans with it. Plaintiff did not leave the disposition of its money with us. After it got these papers it sent the money to us, and we turned it over to Cornelisons and

Cline. We forwarded the papers and received the money as the agent of the borrowers. We did not collect for plaintiff. There was a limited guarantee by the Atlanta company on loans placed by the plaintiff. Plaintiff did rely on inspection of lands and valuations made by the Atlanta company; it did not instruct the company to employ inspectors. The company had inspectors employed, not only for loans placed with plaintiff, but for all other companies. The Atlanta company paid those inspectors. It sent one Fullerton to inspect this loan, and I think it also sent one Mundy to inspect it. Their written reports show what they value the land at. The company placed the loan partly on its reliance on these reports, and upon other things beside. They had the application, Reed's report as to the value of the place and his affidavit as to tax returns, and this affidavit as to the price paid for the land. They relied upon all these, in passing on the loan. All these papers were placed before plaintiff, to enable it to judge for itself whether it would place the loan. While we represented the borrowers in procuring this money for them, we had to put the papers in proper shape before we could get the money. It was the custom to send on the papers and get the money after they reached plaintiff. They always inspected the papers before they sent out the money. They never sent money to us to invest for them. We sometimes sent all the papers with a draft attached, which gave them four days to examine them before paying the draft. Plaintiff assured us that they would take the loan relying on the Atlanta company as to the value of the property, title, etc.; and they advanced the money relying on said company and the papers forwarded at the time. Reed was not authorized by the Atlanta company to negotiate loans for it. He simply took applications and prepared abstracts and submitted them to the company. Of course he was relied upon by said company and by the plaintiff to a large extent. Plaintiff turned down a number of loans that we recom-

mended at different times.    Their custom was, to examine
the papers, and if they accepted the loan they would send
the money, and if they rejected it they would return all
the papers without the money.

Upon the question of the value of the land at the time
the loan was made and since, many witnesses testified.
Those for the plaintiff valued it at from $4,000 to $4,500,
one or two as high as $5,000, and one as low as $2,500 to
$3,000; while the valuations by defendants' witnesses
ranged from $6,000 to $15,000.    Several of these testified
that it had depreciated from a third to a half from the time
the loan was made to the sale by the sheriff in April, 1895.
About 225 of the 990 acres were cultivated.    At the
sheriff's sale the land was bid off by one Brown for the
plaintiff at $5,995.    He had been sent by Richardson to
bid for the property, but he failed to get special instruc-
tions.    Richardson testified that his general instructions,
when he bid in lands for plaintiff, were to bid up some-
where near the amount of the judgment, if necessary to
do so.    The only bidder against Brown was Lewis, whose
highest bid was $5,975.    The sheriff testified, that Brown
refused to let him sell in parcels, and demanded that he
postpone the sale to two o'clock, which he did; that not
many persons were present; and that Lewis wanted the
land sold in parcels and not in bulk.    Defendants intro-
duced the written reports of Fullerton and Mundy as to
the value of the land, made to the Atlanta Trust & Bank-
ing Co., and referred to in Richardson's testimony.    The
first, dated October 5, 1889, shows Lewis to have been the
applicant for the loan, and states that the cash value of the
land is $18,000, and of the buildings $2,000.    The other,
dated December 3, 1889, shows the Cornelisons and Cline
to be the applicants, and gives $16,200 as the value of the
land, and $2,500 as the value of the improvements.    Both
recommend the amounts applied for as choice loans on the
property.

Reed testified: I represented the Atlanta Trust & Banking Co. in securing loans; did not act as agent of plaintiff, but know that all the loans I negotiated were being placed with it by the company. I know that the amount was loaned on the valuation placed on the land by Fullerton and Mundy. If Lewis and his wife were in any way instrumental in securing this loan, I do not know it. It was secured on the statements made in Cornelisons' and Cline's application together, and especially upon the recommendation of the company's land inspectors. Lewis neither said nor did anything, so far as I know, to secure the loan for Cornelisons and Cline. He was not present when the affidavit of the valuation was made. I knew the lands, and believed them to be good security for the amount of the loan. I know that Lewis and his wife had nothing to do with securing the loan, because it was made on the application of Cornelisons and Cline and the inspection of Mundy. The application was made through me, and I was the correspondent of the Atlanta company for the purpose of negotiating loans. I was paid by this company three per cent. on the loan for negotiating it, out of the 18 per cent. retained by them. Lewis had previously applied through me to that company for a loan on the same lands, which was approved by the company; and in the meantime he and his wife contracted for a sale of the land to Cornelisons and Cline, and the loan was to be obtained by them and changed from Lewis. I went with B. W. Cornelison to Atlanta, and arranged it. The loan was made upon the affidavit referred to, and other representations made by Cornelisons and Cline, and upon the report of the inspector. Said affidavit was sworn to by each of the three persons named, and signed by each of them individually. B. W. Cornelison did not at any time refuse to sign it for any cause, and I did not tell him that it was a mere formality and that he need not swear to it, nor anything of that kind. I did not know that $8,000 in cash

had not been paid on the place, as stated in the affidavit, and do not know it yet, for I was not present when the Cornelisons and Lewis traded; and when I wrote the affidavit I put in it just what they told me to state in answer to questions therein. B. W. Cornelison did not protest against signing it on the ground that the statement that $8,000 cash had been paid was not true, nor upon any other ground. Nothing was said by any of them upon that subject. My recollection is that Lewis was not present when the affidavit was being written and signed. If present at all, it was when we first began to write the papers. I remember distinctly that he then left us to attend to some business. The proceeds of the loan were to go to him, and were in fact paid to him or to Veach at his direction and in his presence.

Lewis testified: I made application to the Atlanta Trust & Banking Co. for a loan. I wanted money to pay the balance on the Spencer place (part of the 990 acres in question). The inspector came to look at it with Reed. My wife had money of her own when I married. I bought the Bartow county property with her money; also the John L. Lewis place. The deed was made by mistake to me instead of her. That is part of the land I sold to Cornelisons and Cline. Cline was the main man, because he had some money. I sold the place for $8,000, but do not think I got over $7,200 in fact; knew nothing about the recited consideration of $15,000, and had nothing to do with it. The deed was brought to me by Reed, and I signed it as I thought for a consideration of $8,000. It was not read over to me. I was not present when the affidavit was signed; did not counsel, persuade, induce or procure its signing by any act or word; did not know it was executed until it was brought into court. As to what Cornelison said about getting him and his father into something good for them, I told him that I did not want to run the liquor business for another year; that if his father would advance

some money to buy me out, they could make some money out of it.    I never persuaded or influenced any one to sign any paper pertaining to that sale.    I went with the inspectors and showed them the place as well as I could.    I showed Mundy some corn that was the rent of the place. I was selling whisky that year, made no crop, and had no corn except said rent.    There were about 225 acres of cleared land on the Lewis place in 1889, and 40 acres of bottom land.    There were 275 acres out of the 60 that were rolling and out of the mountains.    I considered the value of the place in 1889 as from $12.50 to $14 an acre. There are 360 acres in the Spencer place, and 640 in the Lewis place.    The Spencer place ought to be worth $8 an acre.    I made no suggestions to the inspectors as to the value of the land.    I did not know that Mundy would be here, but simply happened to be in town that day and carried him out to the farm.    I value the Lewis place at $10,000, and the Spencer place at from $2,500 to $3,000. I gave it in for taxation in 1889 at about $5,000.    That was on the basis of what I thought it would bring if put on the market and sold.    I did give in the place for $3,500 for taxes at one time.    I think the three places cost me $3,500 to $4,000.    I thought it fair to give it in for taxes at the price I paid for it.    I do not think I ever talked with Reed about the Cornelisons loan.    I did not go out there with the inspectors, but did go with Mundy who was inspector for Cornelison.    I was going home at the time, and went out with him.    I went over the place with Fullerton, but was at home there when he came.    I did not go to Atlanta with Cornelison; did nothing to prevent a fair estimate being put on the land by the inspectors; showed them the place as fairly as I could; did not advise or say anything to them as to their valuation.

Mrs. Lewis gave testimony to the effect that the Lewis place was bought with her money; that her husband collected money for her and traded with it; that she had noth-

ing to do with these loans, and knew nothing of the circumstances; and that after the money came in she bought the Dyer place where she now lives (in Bartow county), and had the bond transferred to her.

W. H. Dabney, O. N. Starr, W. R. Rankin and E. J. Kiker, for plaintiffs in error.

W. R. Hammond and W. J. Cantrell & Son, contra.